## THE MARYLAND INSURANCE COMPANY v. WOODS.

ERROR to the circuit court for the district of Maryland, in an action of covenant, upon two policies of insurance, one upon the schooner William & Mary, Travers, master, and the other upon her cargo, "from Baltimore to Laguira, with liberty of one other neighbouring port, and at and from them, or either of them, back to Baltimore." The policy contained the following clause : " Confessing ourselves paid the consideration due unto us for the assurance of the said assured, or his assigns, after the rate of seven and one half *per cent.* on cargo, by said vessel *warranted by the assured to be American property, and that the vessel is an American bottom, proof of which to be required in the United States only.* Insured against all risks. the

*In an action upon a policy on property warranted neutral, "proof of which to be required in the United States only," a sentence of condemnation in a foreign court of admiralty, upon the ground of breach of blockade, is not conclusive evidence of a violation of the warranty.*

MAR. IN. Co.
Woods.

*Quære, whether breach of blockade, by a vessel not warranted neutral, would discharge the underwriters? If a vessel sail to a port within the policy, with intent to go to a port not within the policy, in case the former should be blockaded, this is not a deviation. A vessel might lawfully sail for a port in the West Indies, known to be blockaded, until she was warned off, according to the British orders of April, 1804. She was not bound to make inquiry elsewhere than of the blockading force.*

assured binding himself to do all in his power, in case of capture, for the defence of the property, and, if condemned, that he will enter an appeal if practicable."

Upon the trial of the issue of *non infregit*, seven bills of exceptions were taken. The first was by *Woods*, the plaintiff below, in whose favour the judgment was rendered, and is, therefore, unimportant, excepting that it states the facts which each party offered evidence to prove, and is referred to in all the other bills of exceptions.

It states, that the plaintiff gave evidence, that he was a citizen of the United States, and sole owner of the vessel and cargo, of the value insured, and made insurance thereupon, according to the policies. That the vessel arrived in safety off the port of Laguira, on the 29th of March, but was refused permission to enter the port, except upon terms, as to the sale of his cargo, which the master deemed too disadvantageous to be accepted. That he remained with his vessel off the port, endeavouring to obtain permission to enter it on more advantageous terms, until the 31st of March, when, finding that such permission could not be obtained, he sailed with the vessel and cargo *towards* the port of Amsterdam, in the island of Curraçoa, with a view and intention of ascertaining, by inquiring from British ships of war, or other ships, or by actual inspection, or other proper means, whether the said port was in a state of blockade, and of entering it, if he should find it not blockaded. That about four months before, he had been informed in Baltimore, that an American vessel, bound to that port, had been warned off by the British blockading force; and a report, which he had heard in Baltimore before he sailed, that the island was still blockaded, induced him to suppose, at the time of sailing towards Amsterdam, that that port might still be in a state of blockade, (*he then being ignorant of that fact, and not having been able to obtain information relative thereto off Laguira,*) and to resolve to make

1

inquiry as aforesaid, before he attempted to enter the port. That on the first of April, on his passage to Amsterdam, being then about 28 or 30 miles distant therefrom, he discovered a ship, distant about 21 miles, and immediately changed his course and stood towards her, for the purpose of inquiring whether Amsterdam was still blockaded. The ship was the British ship of war " Fortune," and was then supporting alone the blockade of the port of Amsterdam. While standing towards her, she seized and captured the schooner as prize, under pretence of an attempt to break the blockade, and sent her to Jamaica, where the vessel and cargo were condemned as good prize, whereby they were totally lost to the plaintiff. That the distance of Amsterdam from Laguira was about 147 miles, which may be run in fifteen or twenty hours. That the plaintiff, upon the first intelligence of the capture, offered to abandon, and demanded payment of the loss.

That the British minister, on the 12th of April, 1804, informed the government of the United States, that the siege of Curraçoa was converted into a blockade, which notification the government of the United States did not at any time make known. That the British government had issued an order to their commanders, and to their admiralty courts, in the West Indies, " not to consider blockades as existing, unless in respect to particular ports which may be actually invested, and then not to capture vessels bound to such ports, unless they shall have previously been warned not to enter them." That this order was in force at the time of the capture, and had been notified by the British government to the government of the United States, and immediately published in the gazettes of the United States.

That to the eastward of Laguira, on the Spanish Main, the first port is *New Barcelona*, at the distance of about 57 leagues from *Laguira*. That it is a small port only entered by small vessels. That

the next port to the eastward of Laguira, on the Spanish Main, is *Cumana*, at about the distance of 70 leagues. That about the time of the voyage aforesaid, no vessel could enter the port of *New Barcelona* without having obtained permission therefor at *Cumana*. That the next port on the Spanish Main, from Laguira, westward, is *Porto Cabello*, under the same jurisdiction, and at the distance of about 18 leagues; that no vessel could enter that port without having obtained permission therefor at *Laguira*. That the next port on the Spanish Main, to the westward of *Laguira*, is *Maracaibo*, at the distance of about 93 leagues, and about two and a half degrees further west from the port of Amsterdam. That the usual course of trade for vessels from Baltimore with cargoes for *Laguira*, assorted for the Spanish Main, is to proceed to the port of *Amsterdam*, if refused permission to enter *Laguira*. That vessels in such cases *never* proceed to *Cumana* or *New Barcelona*. That except Amsterdam, and the said ports on the Spanish Main, the nearest port to *Laguira*, used for the purposes of trade, is in the island of *Porto Rico*, distant more than 120 leagues. But that *Carthagena*, on the Spanish Main, although more distant than *Porto Rico*, may be reached from *Laguira* in a shorter time, being more in the course of the winds. That there is no port in the island of *Bonaire*, except a small roadstead on the west side of the island, where there is a small battery and military post. That a vessel bound from Laguira to Amsterdam, could not touch at the said roadstead without going about five leagues out of her way, and being delayed three or four hours, and that there is no other place in the neighbourhood of Laguira or of Amsterdam, except *Porto Cabello*, where information could then have been had respecting the continuance of the blockade.

The *defendants* then offered evidence to the jury, that when Travers sailed from Baltimore, and when he arrived at Laguira, and when he sailed from thence and arrived near the island of Curraçoa, he had reason to believe, and *did know*, that that island

was actually blockaded and *attempted* to enter the <span style="float:right">MAR. IN. Co.<br>v.<br>WOODS.</span> port of Amsterdam. That when the insurance was effected, a vessel might enter Cumana and Porto Cabello without first obtaining permission elsewhere. That the Spanish government was a party in the war. That it has been usual and customary for vessels sailing from Baltimore, having cargoes suitable to the markets on the Spanish Main, to proceed direct to either of the ports of Cumana, New Barcelona, Porto Cabello, Maracaibo, or Carthagena, without first calling at Laguira for permission.

Whereupon the *plaintiff* prayed the direction of the court to the jury, that if they believe the matters so offered in evidence *by h'm*, then the proceeding towards the port of Amsterdam for the purposes and in the manner so by the *plaintiff* stated and offered in evidence, doth not in operation of law deprive him of his right to recover for the said losses under the said policies.

But the court were of opinion, and so directed the jury, that if they shall be satisfied from the evidence in the case, that Travers, the master of the schooner, had reason to believe that the island of Curraçoa was actually blockaded at the time when he sailed from Laguira, and when he arrived near the said island, and that he attempted to enter the port of Amsterdam; then the plaintiff cannot maintain the present action.

To which opinion the plaintiff excepted.

The 2d bill of exceptions stated that the defendants, in addition to the evidence by them offered as stated in the first bill of exceptions, gave in evidence that Captain Travers might have obtained information at Laguira of the blockade of Curraçoa, (it being well and generally known there,) if he had made the inquiry; but that he made no such inquiry.

That there is a small island to the eastward of

Curraçoa, called *Bonaire*, and about 20 miles distant therefrom on the direct and usual route to Curraçoa, and where Captain Travers might also have received information of the blockade, but he sailed past the island without stopping thereat, or taking any measures whatever to learn whether the blockade existed or not. That after Travers found he could not sell his cargo to advantage at Laguira, he *determined* to proceed to *Porto Rico*, and as Curraçoa was very little out of the course, to ascertain whether the blockade still continued. That on the 12th of April, 1804, the blockade of Curraçoa was notified by the British minister to our government, and that there had been no notification of a discontinuance thereof. That when the schooner left Baltimore, it was generally *reported and understood*, that Curraçoa was blockaded. They also offered in evidence the record and proceedings of the admiralty court at Jamaica, and that the schooner was condemned on the ground of an *attempt* to violate the blockade.

Whereupon the PLAINTIFF offered in evidence all the matters by him offered in evidence as stated in the first bill of exceptions, which bill of exceptions is referred and made part of this bill of exceptions, and also offered in evidence that the matters by the defendants stated in this and the foregoing bill of exceptions are untrue; and also that Travers, while lying off Laguira, did inquire whether the blockade of Curracoa still continued, and could obtain no information on that subject; and also that at the time he discovered the ship of war, he might have proceeded to, and entered into, the port of Amsterdam without being intercepted by the frigate.

Upon which aforesaid statement of facts, so given in evidence, the *defendants* pray the court to instruct the jury that the said Travers was not justified in sailing from Laguira and passing the island of Bonaire without inquiring there whether the port of Amsterdam was blockaded, and that in consequence thereof, the plaintiff is not entitled to recover.

*But the court were of opinion*, that if the jury shall be satisfied, from the evidence in the case, that Travers sailed from Laguira for Amsterdam, with intent to enter that port if not actually blockaded, but if blockaded not to attempt to enter, but to sail for the island of St. Thomas ; and if the jury shall be satisfied, from the evidence, that Travers did not attempt to enter the said port, but was captured on his way thither, at the distance of 29 or 30 miles therefrom, the court directed the jury that such conduct of Travers was not unlawful, and that, notwithstanding such conduct, the plaintiff can maintain the present action.

MAR. IN. CO.
v.
WOODS.

The 3d bill of exceptions stated that the defendants, upon all the matters in the preceding bills of exceptions contained, prayed the court to instruct the jury that if they believe that the blockade was notified by the British government to the American government, in a reasonable time before Travers sailed, and that it was generally known in Baltimore before he sailed, and that he had been informed of it, and knew of the general report and belief, and under these circumstances sailed from Laguira to the port of Amsterdam, without making due inquiry at Laguira, whether the blockade subsisted at Amsterdam, and passed Bonaire without making such inquiry, to the place where he was captured, then he was not justifiable in proceeding on the said voyage to Curraçoa, there to make inquiry, not having first made the inquiry in the neighbouring ports of Laguira and Bonaire.

The court refused to give the instruction as prayed, but repeated the instruction stated in the second bill of exceptions; to which the defendants excepted.

The 4th bill of exceptions stated that the defendants prayed the court to direct the jury, that if they shall be of opinion that there are three ports on the Spanish Main, viz. Port Cabello, at the distance of 21 leagues from Laguira, Maracaibo at 93 leagues

from Laguira, and about 2 1-2 degrees. further west than Amsterdam. and Carthagena at the distance of 185 leagues from Laguira to the westward, and that the prevailing winds there are generally from the eastward, and that a voyage may be performed with more facility from Laguira to Porto Cabello than to Curraçoa, and from Laguira to Maracaibo and Carthagena, than to the island of St. Thomas, or Porto Rico. That those ports are situated on the Spanish Main, and under the government and jurisdiction of the King of Spain. That vessels sailing from the ports of the United States, are in the habit of sailing direct to the said ports of Porto Cabello, Maracaibo, and Carthagena without obtaining permission from the government at Laguira. That vessels leaving the United States with cargoes suited to the market on the Spanish Main, frequently sailed from Laguira, to one or other of the above-mentioned ports for the disposal of their cargoes. That the island of Curraçoa belongs to the Dutch government, who were parties to the war. That there are two other ports on the Spanish Main, under the Spanish government, lying to windward of Laguira, viz. Cumana, 70 leagues, and New-Barcelona, 57 leagues from Laguira, but the voyage from Laguira to those ports is more difficult than the voyage to Curraçoa, which is 147 miles. That Curraçoa was known to be blockaded, and so notified by the British government to that of the United States a reasonable time before Travers sailed, and that he knew the same at the commencement of the voyage; then Amsterdam was not a port to which he was entitled to go under the said policy. Which direction the defendants refused to give. And the defendants excepted.

The 5th exception stated that the *defendants* prayed the opinion of the court, upon the whole facts before stated, whether the insured had a right to proceed to Porto Rico, or St. Thomas, under the terms of the policy. That the court directed the jury that he had *no* such right, and that the *defendants excepted.*

The 6th exception stated that the defendants, upon all the matters aforesaid, prayed the court to instruct the jury that if they believe that the insured, after his arrival at Laguira, proceeded on a provisional voyage for the port of Amsterdam, or for Porto Rico, or for St. Thomas, with an intention to go to Amsterdam, if not blockaded, and to Porto Rico, or St. Thomas, if the port of Amsterdam was blockaded, he was not so entitled to do under the policies, and in consequence thereof, that the plaintiff is not entitled to recover. Which direction the court refused to give, but gave the following opinion.

The court having declared that the said Travers had a right to proceed from Laguira to Amsterdam, as is fully stated in their second opinion, to which they refer, they directed the jury that if they find that the said Travers intended, if the port of Amsterdam was blockaded, to go to the island of Porto Rico, or St. Thomas, that such his *intention only* will not affect the policies ; and that notwithstanding such intention the plaintiff can maintain his action thereon. To which direction the defendants excepted.

The 7th bill of exceptions stated that the defendants. upon all the matters in the preceding bills of exception stated, prayed the opinion of the court that if the jury believe that Travers sailed from Laguira, *on a voyage to St. Thomas, or* Porto Rico, but with an intention to proceed a small distance out of the way to see if Amsterdam was blockaded, and in case it was not blockaded then to enter that port, and did so proceed to the port of Amsterdam, and was captured as aforesaid, then the defendants are not answerable; which opinion and direction the court refused to give, but gave the following opinion.

The court having declared that the said Travers had a right to proceed from Laguira to Amsterdam, as is fully stated in their second opinion, to which they refer, they are of opinion, and accordingly directed the jury, that if they find that the said Travers intended, if the port of Amsterdam was

MAR. IN. Co.
v.
WOODS.

blockaded, to go to the island of Porto Rico, or the island of St. Thomas, such his intention only will not affect the policies aforesaid, and that notwithstanding such intention, the plaintiff can maintain his actions on the said two policies. To which instruction the defendants excepted.

The verdict and judgment being in favour of the plaintiff, the defendants brought their writ of error.

*P. B. Key*, for the plaintiffs in error, contended,

1. That the court ought not to have permitted parol evidence to be given of the intention of Captain Travers to break the blockade, because the sentence of condemnation was conclusive evidence of that attempt. Curraçoa was not a port within the policy, because the policy did not give leave to sail to a blockaded port.

2. A *neighbouring* port, means a port on the Spanish Main, under the same government as Laguira.

St. Thomas was not a neighbouring port; if it was, he deviated in going to Curraçoa.

He sailed for Curraçoa with a knowledge that it was blockaded, and therefore the defendants are discharged.

*Harper*, contra.

The evidence is conflicting as to the knowledge of the captain of the blockade, and therefore upon that point this court can give no opinion. The only evidence of such knowledge is, that there was a blockade at a prior period, which had been notified to our government. But there is a difference between a blockade by notification, and a blockade *de facto*. A vessel has a right to go and inquire of the blockading force. The British government had declared that no blockades should be considered as existing

in the West Indies, except blockades *de facto*, and then not to capture them unless they should have been previously warned off. Under this order and declaration of the British government, Travers had a right to go and see whether the port was or was not actually blockaded. This court will not extend the principle of blockade farther than it has been extended by the British government.

The voyage, then, to Curraçoa, was lawful. Travers was in the due course of the voyage, and it was altogether immaterial whether he had any or what ther port eventually in view.

*Martin*, in reply.

Travers had no right to sail for Curraçoa, knowing it to blockaded. If there be in fact a blockade, no vessel knowing that fact has a right to go to the blockaded port for inquiry. If she does, she is not, by the law of nations, entitled to warning, but is good prize at once. *Ille hostis est qui dat auxilium hostibus.* If she sails to a blockaded port, knowing it to be blockaded, she assumes the hostile character, and is to be treated in all respects like an enemy. This was a blockade by notification as well as *de facto*. Our government had express notice, and all our citizens are to be presumed to have notice also.

The British treaty is not in force, but it is a correct exposition of the law of nations on the subject of blockade. *Fitzsimmons* v. *Newport Ins. Co.* 4 *Cranch*, 199.

The sentence is conclusive evidence of the *breach of blockade*, notwithstanding the clause in the policy that proof of the property being American is to be made here only. We admit the property was American—we admit every thing that is to be proved under that clause. But it was not agreed that the question of *breach of blockade* should be tried here only. If the clause is to be so construed, it would place the insurance companies entirely in the power

of the insured, because all the persons on board are the agents of the assured, and interested to justify their own conduct.

It is the duty of the insured and his agents to do nothing to increase the risk, and to do all in his power to avoid loss; and their negligence, or improper conduct will discharge the underwriters. Thus in the case of the *ship Atlantic, Marshall*, 321. want of a passport at first sailing, although obtained before capture, and although the capture was not for want of that paper, yet the underwriters were discharged. The insured is answerable for all the improper conduct of the master if it do not amount to barratry.

Travers knew that Curraçoa was blockaded; at least he had the strongest grounds of believing it; and if he was not certain, he ought to have inquired at Laguira, or at *Bonaire*. This neglect increased the risk and discharged the underwriters.

Curraçoa was not a neighbouring port within the meaning of the policy. It means only a port on the Spanish Main. General expressions may be restrained by the nature of the case. Thus, in the case of *Hogg* v. *Horner*, 2 *Marshall*, 397. the expression in a policy on a voyage from Lisbon to London, " with liberty to touch at any port in Portugal," was construed to mean any port to the northward of Lisbon only.

The fifth exception was taken to the opinion of the court, to show a repugnance between that and the opinion stated in the second bill of exceptions; for if it was unlawful to go to Porto Rico and St. Thomas, it was equally so to go to Curraçoa.

As to the sixth exception to the opinion that the intention to go to St. Thomas in case Curraçoa should be blockaded did not vitiate the policy.

There must, at the commencement of the voyage

from Laguira, be a *certain fixed terminus ad quem.* Otherwise the door would be open to fraud upon the underwriters, as there could be no deviation. It ought to have been entered in the log-book to what por t they were bound.

*Neutral* property may be condemned for violation of blockade. 1 *Rob.* 144. *Ship Neptunus.* We admit the property to be American, and neutral, but this American neutral vessel attempted to break the blockade.

A *notified* blockade is presumed *primâ facie* to continue until the contrary be notified, or the blockade be removed *de facto.* 2 *Rob.* 92, 93. 106. 108. 1 *Marsh.* 65. 1 *Rob.* 131. The Columbia, This vessel, having knowledge of the blockade, was not entitled to the privilege of being warned off.

As to the right to go to Curraçoa to inquire, he cited 1 *Rob.* 280.

*Harper,* contra.

The case cited of the voyage from Lisbon to London, was a mere question as to the meaning of the parties. The nature of the voyage was called in aid of the construction, and it was decided to mean any port in the course of the voyage.

The clause as to proof of the neutrality of the property applies to its neutral character throughout the whole voyage.

Travers had a right to proceed towards ae blockaded port for inquiry, even upon British pi inciples, prior to the order of 1804. But after th it order there can be no doubt.

Although there are *dicta* that a vessel sailing for a blockaded port knowingly is liable to be condemned, yet in no case is it the direct and sole ground of condemnation. In the case of the Co-

lumbia, the vessel was taken in the actual attempt to break the blockade. But this doctrine is over-ruled by the court of errors and appeals in New-York. 1 *Caines' Cases in Error*, 8. 1 *Caines' N. Y. Term Rep.* 12. 1 *Johns.* 256. *Schmidt* v. *N. Y. Insurance Company.*

In 1 *Rob.* 280, 281. *The Betsy*, the limitations of the rule as to sailing for a blockaded port knowingly are stated by Sir William Scott. The distance of the place from whence the vessel sails may excuse. So may also the nature of the blockade. In the West Indies the blockades were so short and uncer-tain as to form an exception to the general rule. 2 *Rob.* 95. *The Neptunus.* But the British order of 1804 is decisive.

*Martin*, in reply.

The British order will not bear that construction. It has never received that construction in their courts. If it had this vessel would not have been condemned.

Nothing but the neutrality of the property is to be proved in this country; not that the vessel did not conduct herself as a neutral.

The case of Fitzsimmons *v.* The Newport Insu-rance Company, was a case of naked *intention*, without an *act* in pursuance of such intention. *Sail-ing* with that intention *is an act.*

*February* 16.

MARSHALL, Ch. J. delivered the following opi-nion of the court, viz.

This cause comes on upon various exceptions to opinions delivered by the circuit court of Maryland.

The first exception, having been taken by the party

who prevailed in the cause, is passed over without
consideration.

The 2d and 3d exceptions are so intimately connected with each other, that they can scarcely be discussed separately.

This action was brought by the owners of the cargo of the William & Mary, to recover from the Maryland Insurance Company the amount of the policy insuring the cargo of that vessel. The voyage insured was " from Baltimore to Laguira, with liberty of one other neighbouring port, and at, and from them, or either of them, back to Baltimore." The cargo was warranted to be American property, and the vessel to be an Ame *can* bottom, " proof of which was agreed to be . . ed in the United States only."

Previous to the sailing of the William & Mary from Baltimore, the blockade of Curraçoa had been notified to the President of the United States, by the British government, and was generally known in Baltimore. The vessel arrived at Laguira, from which place she sailed for some other port, was captured within thirty miles of the port of Amsterdam, in Curraçoa, then actually blockaded, and was condemned for an attempt to break the blockade.

The proof whether the William & Mary sailed from Laguira for Curraçoa, or for St. Thomas's or Porto Rico, is not positive; and the evidence respecting the information which she sought, or might have received, at Laguira, respecting the blockade of Curraçoa, is contradictory. On the part of the plaintiff below, evidence was given that, at Laguira, information of this fact was sought and could not be obtained. On the part of the underwriters, evidence was given, that no inquiry respecting it was made at Laguira, and further, that there was a small island called Bonaire, between Laguira and Curraçoa, not much out of the track from the former place

Mar. In. Co.
v.
Woods.
to the port of Amsterdam, at which no inquiry re-specting the blockade of Amsterdam was made.

The counsel for the underwriters prayed the court to instruct the jury, that, if they believed these facts, the plaintiff could not recover.

This instruction the court refused to give, but did instruct the jury " that if they shall be satisfied, in this case, that Captain Henry Travers, master of the said schooner, sailed from Laguira for the port of Amsterdam, in the island of Curraçoa, with intent to enter the said port, if not actually blocka-ded, but, if blockaded, not to attempt to enter, but to sail for the island of St. Thomas's, and if the jury should be also satisfien, from the said evidence, that the said Henry Tra    did not attempt to enter the said port, but was captured on his way to the said port, at the distance of 29 or 30 miles therefrom. the court are of opinion, and accordingly directed the jury, that such conduct, on the part of the said Henry Travers, was not unlawful, and that, notwith-standing such conduct, the plaintiff can maintain the present action."

This opinion and direction of the circuit court asserts two principles of law.

1. That the sentence and condemnation of a fo-reign court of admiralty, condemning a vessel as prize for attempting to enter a blockaded port, is not conclusive evidence of that fact, in an action on this policy.

2. That, under the circumstances of the case, the sailing from Laguira, and the passing Bonaire, with-out making any inquiry, at either place, respecting the blockade of Amsterdam, were not such acts of culpable negligence as to discharge the underwriters,

1. Is the sentence of a foreign court of admiralty, in this case, conclusive evidence of the fact it asserts?

This depends entirely on the construction given to the policy. The question respecting the conclusiveness of a foreign sentence was, some time past, much agitated throughout the United States, and was finally decided, in this court, in the affirmative. Pending this controversy, a change was introduced in the form of the policy, at several offices, by inserting, after the warranty that the property was neutral, the words, " proof of which to be required in the United States only."

By the underwriters it is contended that these words go to the property only, and not to the conduct of the vessel. By the assured it is contended that they apply to both.

The underwriters insist that the words themselves import no more than that proof respecting the property may be received in the United States, and that a more extended construction is not necessarily to be given to them in consequence of their connection with the warranty of neutrality, because a neutral vessel attempting to enter a blockaded port would thereby discharge the underwriters, although no warranty of neutrality should be found in the policy.

There is much force in this argument, and if the question shall ever occur on such a policy, it will deserve serious consideration. But whatever might be the law in such a case, the majority of the court is of opinion that, under this policy, the sentence of the foreign court of admiralty is not conclusive.

The contract of insurance is certainly very loosely drawn, and a settled construction, different from the natural import of the words, is given, by the commercial world, to many of its stipulations, which construction has been sanctioned by the decisions of courts. One of these is on the warranty that the vessel is neutral property. It is not improbable that, without such warranty, the attempt of a neu-

MAR. IN. Co-<br>v.<br>WOODS. tral vessel to enter a blockaded port might be considered as discharging the underwriters. But no such decision appears ever to have been made; nor is the principle asserted, so far as is known to the court, in any of the numerous treatises which have been written on the subject. On the contrary, the judgments rendered in favour of the underwriters, in such cases, have been uniformly founded on the breach of the warranty of neutrality, which, though in terms extended only to the property, has been carried, by construction, to the conduct of the vessel. It is universally declared that anti-neutral conduct forfeits the warranty that the vessel is neutral.

This being the construction put by the parties, and, in consequence thereof, by courts, on the warranty of neutrality, it is fair to consider the reservation of the right of giving proof in the United States; which, in direct terms, refers to the whole warranty, as intended by the parties to be co-extensive with the warranty itself; and, as the conduct of the vessel was, in legal construction, comprehended in the warranty of her neutrality, that the conduct of the vessel would, in legal construction, be comprehended in the reservation of a right to make proof in the United States.

The majority of the court, therefore, is of opinion, that the circuit court did not err in submitting the testimony respecting the conduct of the vessel, in this case, to the jury.

2. Are the underwriters discharged by the conduct of the captain?

This question is susceptible of several subdivisions.

1. Was the port of Amsterdam, in Curraçoa, a neighbouring port, within the policy?

2. Did the intention to pass Amsterdam, if blockaded, discharge the underwriters?

3. Was an omission to inquire at Laguira or Bonaire, respecting the blockade of Amsterdam, such a culpable negligence as to discharge the underwriters?

It is the opinion of the court that the port of Amsterdam was a neighbouring port within the policy. The distance between the two places is inconsiderable. It is not stipulated that the neighbouring port shall be one under the Spanish government, nor is it to be implied from the nature of the case. Indeed, the common usage of Baltimore, which was given in evidence, for vessels sailing with cargoes assorted for the Spanish Main to and from Laguira to Curraçoa, if refused admittance into the former port, would be conclusive on this point, if, in other respects, it could be doubtful.

Neither was the intention to sail for some other port, on the contingency of finding Amsterdam blockaded, a deviation.

It is admitted that the voyage from Laguira must be certain, and that only a certain voyage would be within the policy. But the opinion of the circuit court was founded on the jury's believing that the voyage from Laguira was for Amsterdam, a voyage which the vessel had a right to make, and that the intention to sail to another port, should Amsterdam be blockaded, constituted no deviation while on the voyage to Amsterdam.

Certainly an intention, not executed, will not deprive the insured of the benefit of his contract in a case in which he would not have been deprived of it, had he executed his intention. Had Captain Travers, on the voyage to Amsterdam, sustained a partial loss, and, after entering that port, determined to go to Porto Rico, or St. Thomas's, it is certain that, after sailing from Amsterdam, the voyage would have been no longer within the policy, nor would the underwriters have been answerable for a subsequent loss. But it could never be contended, with any

semblance of reason, that this discharged them from the loss sustained on the voyage to Amsterdam.

3. The omission of the captain to make any inquiry respecting the blockade of Amsterdam, at Laguira, or to call, for that purpose, at Bonaire, comes next to be considered.

The notoriety of the blockade of Curraçoa, before Captain Travers sailed from Baltimore, must affect him, especially as the instruction given to the jury is not made dependent on their believing that he had no actual knowledge of the fact. It seems a reasonable duty, in ordinary cases, to make inquiry in the neighbourhood, if information be attainable, respecting the continuance of a blockade known previously to exist.

It is true, that upon this point, contradictory evidence was given; but the opinion of the court is predicated on the jury's believing that Captain Travers made no inquiry at Laguira. The correctness of that opinion, therefore, depends on its having been the duty of the captain to make this inquiry.

In an ordinary blockade, this, perhaps, might have been necessary; but it is contended, that blockades in the West Indies were so qualified by the British government, as to have dispensed with this necessity.

It was proved, that orders had been given by that government, to its cruisers and courts of vice-admiralty, which orders were communicated to, and published by, the government of the United States, " Not to consider blockades as existing, unless in respect to particular ports which may be actually invested, and then not to capture vessels bound to such ports, unless they shall have been previously warned not to enter them."

On the motives for this order, on the policy which

dictated this mitigation of the general rule, so far as respected blockades in the West Indies, this court does not possess information which would enable it to make any decision, but it appears essentially to vary the duty of the masters of neutral vessels sailing towards a port supposed to be blockaded.

The words of the order are not satisfied by any previous notice which the vessel may have obtained, otherwise than by her being warned off. This is a technical term which is well understood. It is not satisfied by notice received in any other manner. The effect of this order is, that a vessel cannot be placed in the situation of one having a notice of the blockade until she is warned off. It gives her a right to inquire of the blockading squadron, if she shall not previously receive this warning from one capable of giving it, and, consequently, dispenses with her making that inquiry elsewhere. While this order was in force, a neutral vessel might lawfully sail for a blockaded port, knowing it to be blockaded, and being found sailing towards such port, would not constitute an attempt to break the blockade, until she should be warned off.

There is, then, no error in the opinions to which the second and third exceptions are taken.

The 4th exception is taken to the refusal of the court to give an opinion to the jury, that, under the circumstances stated by the defendants below, the port of Curraçoa was not a neighbouring port within the policy.

The merits of this opinion have been essentially discussed in the view taken of the second and third exceptions, and need not be repeated. The port of Curraçoa is considered as a port within the policy, and, consequently, the circuit court ought not to have given the opinion prayed for by the plaintiffs in error.

The 5th exception presents the extraordinary case of an exception to an opinion in favour of the party taking it, and, consequently, need not be examined.

The 6th exception presents a case not essentially varying from the second and third, and will therefore be passed over without other observation than that it is decided in the opinion on those exceptions.

The 7th exception is to a different point. The counsel for the defendants below prayed the court to instruct the jury, "that if they believed the said Travers sailed from Laguira on a voyage to St. Thomas's, or Porto Rico, but with an intention to proceed a small distance out of the way to see if Amsterdam was blockaded, and in case it was not blockaded, then to enter that port, and did so proceed to the port of Amsterdam, and was captured as aforesaid, then the defendants are not answerable."

This opinion the court refused to give, and proceeded to repeat the instruction to which the second and third exceptions were taken.

If St. Thomas's, or Porto Rico, were not neighbouring ports within the policy, as is most probably the fact, then the voyage from Laguira to either of those places was not insured. If they were neighbouring ports, so that a voyage to either of them was within the policy, then going out of the way to see whether Amsterdam was blockaded was a deviation, and, of consequence, the underwriters are equally discharged.

The only doubt ever felt on this point, was, whether any testimony had been offered to the jury to establish this fact, which would authorize counsel to request the opinion of the court respecting the law. On examining the record, it appears that such testimony was offered. It is stated that the defendants below offered in evidence, that the captain, on finding he could not be permitted to dispose of his cargo at Laguira, but on terms which amounted to a total sacrifice of it, " determined to proceed to Porto

Rico, and, as Curraçoa was very little out of the course, to ascertain whether the blockade still continued."

This evidence might be disbelieved by the jury, but the defendants were certainly entitled to the opinion of the court declaring its legal operation if believed.

It is the opinion of the court, that, in refusing to give the opinion prayed in the seventh exception, the circuit court erred, for which their judgment is reversed, and the cause remanded for a new trial.