Mr. Justice NELSON,
dissenting. The property in this case, vessel and cargo, was seized by a Government vessel on the 20th of May, 1861, in Hampton Roads, for an alleged violation of the blockade of the -ports of the State of Virginia. The Hiawatha was a British vessel and the cargo-belonged to. British subjects. The vessel hau entered the, James. River before the blockade, on *683 her way to City Point, upwards of one hundred miles from the mouth, where she took in her cargo. She finished loading on the 15th of May, but was delayed from departing on her outward voyage till the 17th for want of a tug to tow her down the river. She arrived at Hampton Roads on the 20th, where,, the blockade in the meantime having been established, she was met by one of the ships and the boarding officer endorsed on her register, “ordered not to enter any port in Virginia, or south of it.” This occurred some three miles above the place where the flag ship was stationed, and the boarding officer directed the master to heave his ship to when he came abreast of the flag ship, which was done, when she was taken in charge as prize.
On the 30th April, flag officer Pendergrast, U. S. ship Cumberland, off Fortress Monroe, in Hampton Roads, gave the following notice: “ All vessels passing the capes of Virginia, coming from a distance and ignorant of the proclamation, (the proclamation of the President of the 27th of April that a blockade would be established,) will be warned off; and those passing Eortress Monroe will be required to anchor under the guns of the fort and subject themselves to an examination.”
The Hiawatha, while engaged in putting on board her cargo at City Point, became the subject of correspondence between the British Minister and the Secretary of State, under date of the 8th and 9th of May, which drew from the Secretary of the Navy a letter of the 9th, in which, after referring to the above notioe of the flag officer 'Pendergrast, and stating that it had been sent to the Baltimore and Norfolk papers, and by one or more’ published, advised the Minister that fifteen days had been -fixed as a limit for neutrals to leave the .ports after an adtual blockade had commenced, with or without cargo. The inquiry of the British Minister had referred not only to the time that a vessel would be allowed to depart, but whether it might- be ladened within the time. This vessel, according’ to the advice of the Secretary would be entitled to the whole of the 15th .of May to leave City Point, her port of lading. As we have seen, her cargo was on board within the time, but the vessel was *684 delayed in her departure for want of a tug to tow her down the river.
We think it very clear upon all the evidence that there was no intention on the part of the master to break the blockade, that the seizure under the circumstances was not warranted,'and upon the merits that the ship and cargo should have been restored.
Another ground of objection to this seizure is, that the vessel was entitled to a warning- endorsed on her papers by an officer of. the blockading force, according to the terms of' the proclamation of .the President; and that she was not liable to capture except for the second attempt to leave the port.
The proclamation, after certain recitals, not material in this branch of the case, provides as follows: the President has “deemed it advisable to set on foot a blockade of the ports within the States aforesaid, (the States referred to in the recitals,) in pursuance of the laws of the United States and of the law of nations, in such case made and provided.” “ If, therefore, with a view to violate such blockade, a vessel shall approach or shall' attempt to leave either of said ports, she will be duly warned by the commander of one of the blockading vessels, who will endorse on her register the fact and date of such warning, and if the same vessel shall again - attempt to enter or leave the blockaded port, she-will be captured and sent to the nearest convenient port for such proceedings against her and her cargo, as prize, as may be deemed advisable.”
The proclamation of the President of the 27th of April extended that of the 19th to the States of Virginia and North Garolina.
It will be observed that this warning applies to vessels attempting to enter or leave the port, and is therefore applicable to the Hiawatha.
We must confess that we have not heard any- satisfactory answer to the objection founded upon the terms of this proclamation.
It has been said that the proclamation, among other grounds, as stated on its tace, is founded on the “ law of nations," and *685 hence draws after it the law of blockade as found in that code, and that a warning is dispensed with in all cases where the vessel is chargeable with previous notice or knowledge that the port is blockaded. But the obvious answer to the suggestion is, that there is no necessary connection between the authority upon which the proclamation is issued and the terms prescribed as the condition of its penalties or enforcement, and, besides, if founded upon the law of nations,' surely it was competent for the President to mitigate the rigors of that code and apply to" neutrals the more lenient and friendly principles of international law. We do not doubt but that considerations of this character influenced the President in prescribing these favorable terms in respect to neutrals; for, in his message a few months later to Congress, (4th-of July,) he observes: “ a proclamation was issued" for closing the ports of the insurrectionary districts” (not by blockade, but) “by proceedings in the nalv,re of a blockade.”
‘This view of the proclamation seems to have been entertained by the Secretary of the Navy, under whose orders it was carried into execution. In his report to the President, 4th July, he observes, after referring to the necessity of interdicting commerce at those ports where the Government were not permitted to collect the revenue, that “in the performance of this domestic municipal duty the property and interests of foreigners became, to some extent, involved in our home questions, and with a view of extending to them every comity that circumstances would justify, the rules of blockade were adopted, and, as far as practi ■ cable, made applicable to the cases that occurred under this embargo or non-intercourse of the insurgent States. The commanders, he observes, were directed to permit ■ the vessels of foreigners to depart within fifteen days as in case of actual effective blockade, and their vessels were not to be seized unless they attempted, after having been once warned off, to enter an interdicted port in disregard of such warning.”
The question is not a new one in this Court. The British Government had notified the United States of the blockade of certain ports in the West Indies, but “not to consider blockades as existing, unless in respect to particular ports which may be . *686 actually invested, and, then, not to capture vessels bound to such ports, unless they shall have been previously warned not to enter them.”
The question arose upon this .blockade in Mar. In. Co. vs. Woods, (6 Cranch, 29.)
Chief Justice Marshall, in delivering the opinion of the Court, observed, “ The words of the order are not satisfied by any previous notice which the vessel may have obtained, otherwise than by her being warned off. • This is a technical term which is well understood. It is not satisfied by notice received in any other manner. The effect of this order is, that a vessel cannot be placed' in the situation of one having notice of the blockade until she is warned off. It gives her a right to inquire of the blockading squadron, if she shall not receive this warning from one capable of giving it, and, consequently, dispenses with her making that inquiry elsewhere. While this order was in force a neutral vessel might lawfully sail for a blockaded port, knowing it to be blockaded, and being found sailing towards such port, would not constitute an attempt to break the blockade until ' she should be warned off.”
We are of opinion, therefore, that, according to the very terms of the proclamation, neutral ships were entitled to a warning by one of the blockading squadron and could be lawfully seized only on the second attempt to' enter'or leave the port.
It is remarkable, also, that both the President and the Secretary, in referring to the blockade, treat the measure, not as a blockade under the law of nations, but as a restraint upon commerce at the interdicted ports under the municipal laws of the Government.
Another objection taken to the seizure of this vessel and cargo is, that there was no existing war between the United States and the States in insurrection within the meaning of the law of nations, which drew after it the consequences of a public or civil war. A contest by force between independent sovereign States is called a public war; and, when duly commenced by proclamation or otherwise, it entitles both of the belligerent parties to all the rights of war against each other, and as respects *687 neutral nations. Chancellor Kent observes, “ Though- a solemn declaration, or previous notice to the enemy, be now laid aside, it is essential that some formal public act, proceeding directly from the competent source, should announce to the people at home their new relations and duties growing out of a state of war, and which should equally apprize neutral nations of the fact, to enable them to conform their conduct to the rights belonging to the new state of things.” “ Such an official act operates from its date to legalize all hostile acts, in like manner as a treaty of peace operates from its date to annul them.” He further observes, "as war cannot lawfully be commenced on the paTt of the United States without an act of Congress, such act is, of course, a formal notice to all the world, and equivalent to the most solemn declaration.”
I The legal consequences resulting from a state of war between two countries at this day are well understood, and will be found described in every approved work on the subject of international law. The people of the two countries become immediately the enemies of each other — all intercourse commercial or otherwise between them unlawful — all contracts existing at the commencement of the war suspended, and all made during its existence utterly void. The insurance of enemies’ property, the drawing of bills of exchange or purchase on the enemies’ country, the remission of bills or money to it are illegal and void. Existing partnerships between citizens or subjects of the two countries are dissolved, and, in fine, interdiction of trade and intercourse direct or indirect is absolute and complete by the mere force and effect of war itself. All the property of the people of the two countries on land or sea are subject -to capture and confiscation by the adverse party as enemies’ property, with1 certain qualifications as it respects property on land, (Brown vs. United States, 8 Cranch, 110,) all treaties between the belligerent parties are annulled,'; The ports of.the respective countries may be blockaded, and letters of marque and reprisal granted as rights of war, and the law of prizes as defined by the law of nations comes into- full and complete operation, resulting from maritime captures jure belli. War also effects a change in the *688 mutual relations of all States or countries, not directly, as in the case of the belligerents, but immediately and indirectly, though they take no part in the contest, but remain neutral.
This great and pervading change in the existing condition of a country, and in the relations of all her citizens' or subjects, external and internal, from a state of peace, is the immediate effect and result of a state of war: and hence the same eode which.has annexed to the existence of a war all these disturbing consequences has declared that the right of making war belongs exclusively to the supreme or sovereign power of the State.
This power in all civilized nations is regulated by the fundamental laws or municipal constitution of the country.
By our Constitution this power is lodged in Congress. Con- . gress shall have power “ to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water.”
We have thus far been considering the status of the citizens or subjects of a country at the breaking out of a public war when recognized or declared by the competent power.
In the case of a rebellion or resistance of a portion of the people of a country against the established government, there is no doubt, if in its progress'and enlargement the government .thus sought to be overthrown sees fit, it may by the competent power recognize or declare-the existence of a state of civil war, which will draw after it all the consequences and rights of war between the contending parties as in the case of a public war. Mr. • Wheaton'observes, speaking of civil war, “But the.general usage of nations regards such a war as entitling both the contending parties to all' the rights of war as against each other, and even as respects neutral nations.” It is not to be denied, therefore, that if a civil war existed between that portion of the people in organized insurrection fo overthrow this Government at the time this vessel and cargo were seized, and if she was guilty':'of a violation of the'blockade, she would be lawful prize of war. But before this insurrection against the established Government can be dealt with on the footing of a- civil war, within the meaning^of the law of nations and the Constitution *689 ' of the United ■ States, and which will draw after it belligerent rights, it must be recognized or declared by the war-making power of the Government. No power short of this can change the legal status of the Government or the relations of its citizens from that of peace to a state of war, or bring into existence all those duties and obligations of neutral third parties growing out of a state of war. The war power of the Government must be exercised before this changed condition of the Government and people and of neutral third parties can be admitted. There is no difference in this respect between a civil or a public war.
We have been more particular upon- this branch of the case than would seem to be required, on account of any doubt or difficulties attending the subject in view of the approved works upon the law of nations or from the adjudication of the courts, but, because some confusion existed on the argument as to tbe definition of a war that drew after it all the rights of prize of war. Indeed, a great portion of the argument' proceeded upon the ground that these rights could be called into operation— enemies’ property captured — blockades set on foot and' all the rights of war enforced in prize courts — by a species of war unknown to the law of nations and to the Constitution of the United States.
.An idea seemed to be entertained that all that was necessary to constitute a war was organized hostility in the district of country in a state of rebellion — that conflicts on land-and on sea. - — the taking of towns and capture of fleets — ifi fine, the magnitude and dimensions of the resistance against the.Government-T-constituted war with all the belligerent rights belonging, to civil war. With a view to enforce this idea, we- had, during the argument, an imposing historical detail of the several measures adopted by the Confederate States to enable them to resist the authority of the general Government, and of many bold and daring acts óf resistance and of conflict. It was said' that war ' was to be ascertained by looking at the armies and navies or public force of the' contending parties, and. the battles lost and won — that in the language of one of the learned counsel, “Whenever -the situation of opposing hostilities^has assumed the pro *690 portions and pursued. the methods of war, then peace is driven out, the ordinary authority and administration of law are suspended and war in fact and by necessity is the status of the nation until peace is restored and the laws resumed their dominion.”
Now, in one sense, no doubt this is war, and may be a war of the most extensive and threatening dimensions and effects, but it is a statement simply of its existence in a material sense, and has no relevancy or weight when the question is what constitutes war in a legal sense, in the sense of the law of nations; and of the Constitution of the United States? For it must be a war in this sense to attach to it all the consequences that belong to belligerent rights. Instead, therefore, of inquiring after armies and navies, and victories lost and won, or organized rebellion against the general Government, the inquiry should be into the law of nations and into the municipal fundamental laws of the Government. For we. find there that to constitute a civil war in the sense in which we are speaking, before it can exist, in contemplation of law, it must be recognized or declared by the sovereign power of the State, and which sovereign power by our Constitution is lodged in the Congress of the United States —civil war, therefore, undei our system of government, can exist only by an act of Congress, which requires the assent of two of the great departments of the Government, the Executive and Legislative.
We have thus far been speaking of the war power under the Constitution of the United States, and as known and recognized by the law of nations. But we are asked, what would become of the peae'e and integrity of the Union in case of an insurrection at home or invasion from abroad if this power could not bo exercised by the President in the recess of Congress, and until that' body could be assembled ?
The framers of the Constitution fully comprehended this'question, and provided for the contingency. Indeed, /it would have been surprising if they had not, as a rebellion had occurred in the State of Massachusetts while the Convention was in session, and which had become so general that it was quelled only by *691 calling upon the military power of the State. The Constitution declares that Congress shall have power “to provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions.” Another clause, “ that the President shall be Commander-in-chief of the Army and Navy of the United States, and of the militia of . the several States when called into the actual service of the United Statesand, again, “ He shall take care that the laws shall be faithfully executed.” Congress passed laws on this subject in 1792 and 1795. 1 United States Laws, pp. 264, 424.
The last Act provided that whenever the United States shall be invaded or be in imminent danger of invasion from a foreign nation, it shall be lawful for the President to call forth such number of the militia most convenient to the place of danger, and in case of insurrection in any State against the Government thereof, it' shall be lawful for the President, on the application of the Legislature of such State, if in session, or if not, of the Executive of the State, to call forth such number of militia of any other State or States as he may judge sufficient to suppress such insurrection.
The 2d section provides, that when the laws of the United States shall be opposed, or the execution obstructed in any State by combinations too powerful to be suppressed by the course of judicial proceedings, it shall be lawful for the President to call forth the militia of such State, or of any other State or States as may be necessary to -suppress such combinations; and by the Act 3 March, 1807, (2 U. S. Laws, 443,) it is provided that in .case of insurrection or obstruction of the laws, either in the United States or of any State or Territory, where it is lawful' for the President to call forth the militia for the purpose of suppressing such insurrection, and causing the laws to be executed, it shall be lawful, to' employ for the same purpose such part of the land and naval forces of the United States as shall be judged necessary.
It will be seen, therefore, that ample provision has been made under the Constitution and laws against any sudden and unexpected disturbance of the public peace from insurrection at home *692 or invasion from abroad. The whole military and naval power of the country is. put under the control of the President to meet the emergency. He may call out a. force in proportion to its necessities, one regiment or fifty, one ship-of-war or any number at his discretion. .If, like the insurrection in the State of Pennsylvania in 1793, the' disturbance is confined to a small district of country, a few regiments of the militia may be sufficient to suppress it. If of the dimension of the present, when it first broke out, a much larger force would be required. But what ever its numbers, whether great or small, that may be required, ample provision is here made; and whether great or small, the nature of the power is the same. It is the exercise of a power under the municipal laws of the country and not under the law of nations; and, as we see, furnishes the most ample means of repelling attacks from abroad or suppressing disturbances at home until the assembling of Congress, who can, if it be deemed. necessary, bring into operation the war power, and thus change the nature and character of the contest. Then, instead of being carried on under the municipal law of 1795, it would be under the law of nations, and the Acts of Congress as war measures with alTthe rights of war.
It has been argued that the authority conferred on the President by the Act of 1795 invests him with the war power. But the obvious answer is, that it proceeds from a different clause in the Constitution and which'is given for different purposes and objects, namely, to execute the laws and preserve the public order and tranquillity of the country in a time of peace by preventing or suppressing any public disorder or disturbance by foreign or domestic enemies. Certainly, if there is any force in this argument, then we are in a state of war with all the rights of war, and' all the penal consequences attending it every time this power is exercised by calling out a military force to execute the laws or to suppress insurrection or rebellion; for the nature of the power cannot depend upon the numbers called out. Ii so, what numbers will constitute war and what numbers will not? It has also been'argued that this.power of the President from necessity should be construed as vesting him with the war *693 power, or the Republic might greatly suffer or be in danger from the attacks of the hostile party before the assembling of Congress. But we have seen that the whole military and -naval force are in his hands under the municipal laws of the country. He can meet the adversary upon land and water with all the forces of the Government. The truth is, this idea of the existence of any necessity for clothing the President with the war power, under the Act of 1795, is simply a monstrous exaggeration ; for, besides having the command of the whole of the army -and navy, Congress can be assembled within any thirty days, if the safety of the country requires that the war power shall be brought into operation.
The Acts of 1795 and 1807 did not,- and could not under the Constitution, confer on the President the power of declaring war against a State of this Union, or of deciding that war existed, and upon that ground authorize the capture and confiscation of the property of every citizen of the State whenever it was found on the waters. The laws of war, whether the war be civil or inter gentes, as we have seen, convert every citizen of the hostile Sl.ate into a public enemy, and treat him accordingly, whatever may have been his previous conduct. This great power over the business and property of the citizen is reserved to the legis lative department by the express words of the Constitution. If cannot be delegated or surrendered to the Executive. Congress alone can determine whether war exists or should be declared; and until they have acted, no citizen of the State can be punished in his person or property, unless he has committed some offence against a- law of Congress passed before the act was committed, which made it a crime, and defined the punishment. The penalty of confiscation for the acts of others with ■ which he had no concern cannot lawfully be inflicted.
In the-breaking out of a rebellion against the established Government, the usage in all civilized countries, in its first' stages, is to suppress it by confining the public forces and the operations of the Government against those in rebellion, and at the same time extending encouragement and support to the loyal people with a view to their co-operation in putting down the *694 insurgents. This course is not only the dictate of wisdom, but of justice. This was the practice of England in Monmouth’s rebellion in the reign of James the Second, and in the rebellions of 1715 and 1745, by the Pretender and-his son, and also in the beginning of the rebellion of the Thirteen Colonies of 1776. It is a personal war against the individuals engaged in resisting the authority of the .Government. This was the character of the war of our Revolution till the passage of the Act of the Parliament of Great Britain of the 16th of George Third, 1776. By that act all trade and commerce with the Thirteen Colonies was interdicted and all ships and cargoes belonging to the inhabitants subjected to forfeiture as if the same were the ships and effects of open enemies. From this time the war became a territorial civil war between the contending parties, with all the rights of war known to the law of nations. Down to this period the war was personal against the rebels, and encouragement and support constantly extended to the loyal subjects who adhered to their allegiance, and although the power to make war existed exclusively in the King, and of course this personal war carried on under his authority, and a partial exercise of the war power, no captures of the ships or cargo of the rebels as enemies’ property on the sea, or confiscation in Prize Courts as rights of war, took place until after the passage of the Act of Parliament. Until the passage of the act the American subjects were not regarded as enemies in the sense of the law of nations. The distinction between the loyal and rebel subjects was constantly observed. That act provided for the capture and confiscation as prize of their property as if the same were the property " of open enemies.”' For the first time the distinction was obliterated.
•So the war carried on by the President against the insurrectionary districts in the Southern States, as in the case of the King of Great Britain in the American Revolution, was a personal war against those in rebellion, and with encouragement and support of loyal citizens with a view to their co-operation and aid in suppressing the insurgents, with this difference, as the war-making power belonged to the King, he might have recognized or declared the war at the beginning to be a civil war *695 which would draw after it all the rights of a belligerent, but in the case of the President no such power existed: the war therefore from necessity was a personal war, until Congress assembled and acted upon this state of things.
Down to this period the only enemy recognized by the Government was the persons engaged in the rebellion, all others were peaceful citizens, entitled to all the privileges of citizens under the Constitution. Certainly it cannot rightfully be said that the President has the power to convert a loyal citizen into a belligerent enemy or confiscate his property as enemy’s property.
Congress assembled on the call for an extra session the 4th of July, 1861, and among the first acts passed was one in which the President was authorized by proclamation to interdict all trade and intercourse between all the inhabitants of States in insurrection and the rest of the United States, subjecting vessel and cargo to capture and condemnation as prize, and also to direct the capture of any ship or vessel belonging in whole or in part to any inhabitant of a State whose inhabitants are declared by the proclamation to be in a state of insurrection, found at sea or in any part of the rest of the United States. Act of Congress of 13th of July, 1861, secs. 5, 6. The 4th section also authorized the President to close any port in a Collection District obstructed so that the revenue could not be collected and provided for the capture and condemnation of any vessel attempting to enter.
The President’s Proclamation was issued on the 16th of August following, and'embraced Georgia, North and South Carolina, part ■of Virginia, Tennessee, Alabama, Louisiana, Texas, Arkansas Mississippi and Florida.
Tnis Act of Congress, we think, recognized a state of civil war between the Government and the Confederate States, and made it territorial. The Act of Parliament of 1776, which converted the rebellion of the Colonies into a civil territorial war,' resembles, in its leading features, the act to which we have referred. Government in recognizing dr declaring the existence of a civil war between itself and a portion of the people in insurrection usually modifies its effects with a view as far as *696 practicable to favor the innocent and loyal citizens or subjects involved in the war. It is only the urgent necessities of the Government, arising from the magnitude of the resistance, that can excuse the conversion of the personal into a territorial war,- and thus confound all distinction between guilt and innocence , hence the modification in the Act of Parliament declaring the territorial war.
It is found in the 44th section of the Act, which for the encouragement of well affected persons, and • to afford speedy protection to those desirous of returning to their allegiance, provided for declaring such inhabitants of any colony, county, town, port, or place, at peace with his majesty, and after such notice by proclamation there should be no further captures. The Act of 18th of July provides that the President may, in his discretion, permit commercial intercourse with any such part of a State or section, the inhabitants of which are declared to be in a state of insurrection (§ 5), obviously intending to favor loyal citizens and encourage others to return to their loyalty. And the 8th section provides that the Secretary of the Treasury may mitigate or remit the forfeitures and penalties incurred under the act. The Act of 31st July is also one of a kindred character. That appropriates $2,000,000 to be expended under the authority of the President in supplying and delivering arms and munitions of war to loyal citizens residing in any of the States of which the inhabitants are in rebellion, dr in which it may be threatened. We agree, therefore, that the Act 13th July, 1861, recognized a state of civil war between the Government and the people of the Statés described in that proclamation.
The cases of the United States vs. Palmer, (3 Wh., 610); Divina Pastora, and 4 Ibid, 52, and that class of cases to be found in the reports are referred to as furnishing authority for the exercise of the war power claimed for the President in the present case. These cases hold that when the Government of the United Statés recognizes a state of civil war to exist between a foreign nation and her colonies, but remaining itself neutral, che Courts are bound to consider as lawful all those acts which the new Government may direct against the enemy, and we *697 admit tbe President wbo conducts the foreign relations of the Government may fitly recognize or refuse to do so, the existence of civil war in the foreign nation under the circumstances stated.
But this is a very different question from the one before us, which is whether th'e President can recognize or declare a civil war, under the Constitution, with all its belligerent rights, between his own Government and a portion of its citizens in a state of insurrection. That power,, as we have seen, belongs to Congress. We agree when such a war is recognized or declared to exist by the war-making power, but not otherwise, it is the duty of the Courts to follow the decision of the political power of the Government.
The case of Luther vs. Borden et al., (7 How., 45,) which arose out of the attempt of an assumed new government in the State to overthrow the old and established Government of Rhode Island by arms. The Legislature of the old Government had established martial law, and the Chief Justice in delivering the opinion of the Court observed, among other things,'that “if the Government of Rhode Island deemed the armed opposition so formidable and so ramified throughout ■ the State -ás to require the use of its military forcp, and the declaration of. martial law, we see no ground upon which this Court can question its authority. It was a state of war, and the established :Government resorted to the rights and usages of war to maintain itself and overcpme the unlawful opposition.”
But it is only necessary to say, that the term “war” must necessarily have been used here by the Chief Justice in its popular sense, and not as known to the law of natiqns, as the State of Rhode Island confessedly possessed no power under the Federal Constitution to declare war.
Congress on the 6th of August, 1862, passed an Act confirming all acts, proclamations, and orders .of the President, after the 4th of March, 1861, respecting the army and navy, and legalizing them,, so far as was competent for that body, and it has been suggested, but scarcely argued, that this legislation on the subject had the effect to bring into existence an ex post facto civil war with all the rights of capture and confiscation, jure *698 belli, from the date referred to. An ex post facto law is defined, when, after an action, indifferent in itself, or lawful, is committed, the Legislature then, for the first time, declares it to have been a crime and inflicts punishment upon the person who committed it. The principle is sought to be applied in this case. Property of the citizen or foreign subject engaged in lawful trade at the time, and illegally captured, which must betaken as true if a confirmatory act be necessary, may be held and confiscated by subsequent legislation.' In other words trade and commerce authorized at the .time by acts of Congress and treaties, may, by ex post facto legislation, be changed into illicit trade and commerce with all its penalties and forfeitures annexed and enforced. The instance of the seizure of the Dutch ships in 1808 by Great Britain before the war, and confiscation after the declaration of war, which is well known, is referred to as an authority. But there the ships were seized by the war power, the orders of the Government, the seizure being a partial exercise of that power, and which was soon after exercised in full.
The precedent is one which has not received the approbation of j urists, and is not to be followed. See W. B. Lawrence, 2d ed. Wheaton’s Element of Int. Law, pt. 4, ch. 1. sec. 11, and note. But, admitting its full weight, it affords no authority in the present case. Here the captures were without' any Constitutional authority, and void; and, on principle, no subsequent ratification could make them valid.
Upon the whole, after the most careful consideration of this case which the pressure of other duties has admitted, I am compelled to the conclusion that no civil war existed between this Government and the States in insurrection till recognized by the Act of Congress 13th of July, 1861; that the President does not possess the power under the Constitution to declare war or recognize its existence within the meaning of the law of nations, which carries with it belligerent' rights, and thus change the country and all its citizens from a state of peace to a state of war; that this power belongs exclusively to the Congress of the United States, and, consequently, that the President had no power to set on foot a blockade under the law of nations, and *699 that the capture of the vessel and .cargo ip this case, and in all cases before us in which the capture occurred before the 18th of July, 1861, for breach of blockade, or as enemies’ property, are illegal and void, and that the decrees of condemnation should be reversed and the vessel and cargo restored.
Mr. Chief Justice TANEY, Mr. Justice CATRON and Mr. Justice CLIFFORD, concurred in the dissenting opinion of Mr. Justice Nelson.