ANTONIO TAVERNA and Another, Respondents, *v.* PALATINE INSURANCE COMPANY OF LONDON, ENGLAND, Appellant, Impleaded with THE ROME SAVINGS BANK, Defendant.

Fourth Department, January 8, 1930.

*Edward L. O'Donnell,* for the appellant.

*Searle & Searle [D. Francis Searle* of counsel], for the respondents.

EDGCOMB, J. On July 1, 1925, appellant, a fire insurance company authorized to do business in New York State, issued its policy by the terms of which it insured the plaintiffs against direct loss and damage by fire to an amount not exceeding $2,000 on a two-story frame building situate at 118 Second street in the city of Rome, N. Y., while the same was occupied for a dwelling and bakery, and for $300 on household and personal property belonging to the insured, or any member or servant of the family, while contained in said building. The contract of insurance was the usual standard form policy of this State, and contained a provision that, unless otherwise provided by agreement in writing added thereto, the company should " not be liable for loss or damage occurring  *  *  *  while the hazard is increased by any means within the control or knowledge of the insured."

About six o'clock on the morning of February 12, 1928, the insured building caught fire, and was partially destroyed. Defendant repudiated its liability, and this action was brought to recover the damages sustained. The fire, the damage and the filing of proofs of loss were all admitted. The company disclaimed liability upon the sole ground that after the policy was written and before the fire, without any consent on its part and without any provision therefor being added to the contract of insurance, the hazard was increased by means within the knowledge or control of the pla ntiffs.

The firemen discovered in the middle apartment a large amount of alcohol, some of which was denatured, and three copper stills, one of which had been completely set up and was working at the

time. Nothing of that kind was on the property when the policy was written, or prior to January 1, 1928. The trial court held that the alcohol and its distillation on the premises actually increased the hazard, and left it to the jury to say whether this additional risk was within the control or knowledge of the insured.

While, as a general rule, the question of whether the risk or hazard has been increased is one of fact, there are conditions and situations which make it a question for the court rather than the jury. We think that, under the facts in this case, the learned court below was correct in holding that, as matter of law, the setting up of the stills and the storing of the alcohol in the building increased the hazard. (*Coffaro* v. *Queen Ins. Co.*, 217 App. Div. 197, 199.)

The fact that the fire broke out in the rear of the building, and was not occasioned by the presence of the stills or the alcohol, is immaterial, since the risk, occasioned by their presence, became other than that agreed to by the parties. (*Filardo* v. *National Union Fire Ins. Co.*, 224 App. Div. 136; *Ertischek* v. *New Hampshire Fire Ins. Co.*, 179 id. 827.)

There is evidence which, if believed, would warrant a finding that the plaintiffs were ignorant of the installation of the stills in the building, or the distillation of alcohol therein. That being so, a question of fact was presented for the jury. We think, however, that the verdict was against the weight of the evidence, and that the jury were wrong in exonerating the plaintiffs of all knowledge of what was going on in their property, and while we hesitate to substitute our judgment for that of a jury, we feel that, in the interest of justice, this verdict should not be allowed to stand.

The building in question faced the west and fronted on Second street. In the front was an apartment which occupied both floors. Toward the rear, and in the center of the building, were two four-room apartments, one on the first and the other on the second floor. The only entrance to these flats was from two doors, close together, opening off a small porch on the south side of the building, and back some distance from Second street. In the rear of these two middle apartments was a bakery, and back of that was a garage. A driveway extended from the street along the southerly side of the building. The entrance to the bakery was on the south side of the building off this driveway. A door opened from the bakery into the lower middle apartment, but this was locked and nailed at the time of the fire, and had to be broken open.

Plaintiffs lived at 116 Second street, the house immediately south of the insured building. The entrance to their home was on the north side of the building, nearly opposite, and twelve or fifteen feet from the entrance to the middle apartments in which

the stills were found. Mrs. Taverna was ailing, and was home practically all the time for a couple of months before the fire. Mr. Taverna was not steadily employed, and was at home a good portion of the day during January and February, and was frequently in and out of the house. Every time he entered his house, he went within plain sight of the entrance of the middle flats. Each still had a capacity of one hundred gallons, and was so large that it could not be moved in or out of the building through any door or window. They had to be taken in the house in pieces, and set up and built within the rooms. They were from four to four and a half feet in diameter and six feet high. An intricate maze of pipes and condensers ran from the cookers on the first floor to the rooms above, holes about eighteen inches square having been cut in the ceiling to allow this work to be done. A vat four and a half or five feet high was being constructed out of staves, but was not yet completed at the time of the fire. All of this material had to be taken into the building through the door opposite the entrance to plaintiffs' house. This work could not have been done without making considerable noise. The odor from the still would, of necessity, permeate the neighborhood. To say that it would be possible for all this to go on under the nose of the owners, who all this time were living in such close proximity to the property, and they know nothing of it, is to tax one's credulity to the breaking point.

But this is not all. In their attempt to show their innocence of anything wrong in the use of the building, plaintiffs tell of an alleged lease to some stranger. Mr. Taverna says that, in the latter part of December, 1927, a stranger came to him and wanted to rent both apartments, one for himself and the other for his sister-in-law, who was coming over from the old country. We are told that he paid forty-five dollars, one month's rent for the two floors, and departed. Mr. Taverna says he gave him a receipt. He asked for no written lease, nor was anything said about the length of time he was to have the property. He did not move in, and nothing more was heard from him until February first, when he appeared as mysteriously as he did the month before, and paid another forty-five dollars, saying that his wife and sister-in-law had not yet arrived in this country. He was given another receipt, according to the story of the plaintiffs. He departed, and plaintiffs insist that they never saw him again. Although this mysterious stranger gave his name, and said that he lived on Catherine street in Utica, respondents made no effort to find or produce him on the trial. Within a day or two after paying the February rent, respondents noticed a padlock on each of the doors leading into the middle

apartments. Up to this time there were no curtains on the windows. When the padlocks were put on, two dark curtains were put up on the two southerly windows on the lower floor next to the porch, and past which people would pass in going to the bakery. Respondents noticed all this, but insist that their suspicions were not aroused, and that they were not put on inquiry concerning their enigmatical tenant.

How an owner, living next door, could, under all these circumstances, be ignorant of what was going on in his own building is difficult to understand. It is equally incredible that, if this property had been rented, as claimed by plaintiffs, the tenant would have been willing to go to all this expense when he only had a lease from month to month, and when he must have known that it would have been impossible to continue in this illicit business without the owner and other tenants in the building discovering what was going on.

The evidence of respondents of their lack of knowledge is all given by interested persons. The inferences to the contrary are so convincing that we are at a loss to understand how the jury could have gone so far astray. The verdict was clearly against the weight of evidence, and should be set aside.

The judgment should be reversed on the facts and a new trial ordered, with costs to appellant to abide event.

All concur. Present — SEARS, P. J., TAYLOR, EDGCOMB, THOMPSON and CROSBY, JJ.

Judgment and order reversed on the facts and a new trial granted, with costs to the appellant to abide the event.